Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 11, 2003      Decided April 9, 2004

No. 02-1089

CRETE CARRIER CORPORATION, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND
CHRISTINE TODD WHITMAN, ADMINISTRATOR,
ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

———

Consolidated with
02-1223, 03-1053

———

On Petitions for Review of Orders of the
Environmental Protection Agency

———

*David P. Novello* argued the cause and filed the briefs for petitioners.

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Eileen T. McDonough*, Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief was *Michael J. Horowitz*, Attorney, U.S. Environmental Protection Agency.

Before: GINSBURG, *Chief Judge*, and SENTELLE and HENDERSON, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: Operators of five large-haul truck fleets challenge the Environmental Protection Agency's refusal to reconsider the 2004 Standard for nitrous oxide (NOx) and nonmethane hydrocarbon (NMHC) emissions from "heavy heavy-duty" diesel engines. Because the Trucking Companies have failed to show their injury is fairly traceable to the 2004 Standard, we dismiss their petition for lack of standing under Article III of the Constitution of the United States.

## I. Background

In the 1990 Amendments to the Clean Air Act the Congress authorized the EPA to promulgate regulations limiting NOx and NMHC emissions from "classes or categories of heavy-duty vehicles or engines." 42 U.S.C. § 7521(a)(3)(A)(i). The EPA identified three categories of heavy-duty diesel engines for the purpose of regulating emissions: light, medium, and heavy. *See* 40 C.F.R. § 86.090–2. The Trucking Companies' petition concerns only the EPA's regulation of emissions from heavy heavy-duty diesel engines (HHDDEs), which are the engines used in large-haul tractors (truck cabs).

Section 7521(a)(3)(A)(i) provides that any requirements applicable to heavy-duty engines

> shall contain standards which reflect the greatest degree of emission reduction achievable through the application of technology which the Administrator determines will be available for the model year to which such standards apply, giving appropriate consideration to cost, energy, and safety factors associated with the application of such technology.

42 U.S.C. § 7521(a)(3)(A)(i). This is a technology-forcing provision; it mandates regulations with which manufacturers can comply only by adopting new technologies as they become available.

The EPA promulgated three emissions standards for HHDDEs. One standard, applicable to engine model years 1998 to 2003, implements the statutory maximum for NOx emissions of "4.0 grams per brake horsepower hour [(g/bhp-hr)]." *See* Control of Emissions of Air Pollution From 2004 and Later Model Year Heavy–Duty Highway Engines and Vehicles, 65 Fed. Reg. 59,896, at 59,898 (Oct. 6, 2000). For model years 2004 to 2006 the standard is a 2.5 g/bhp-hr of NOx plus NMHC. *See* Control of Emissions of Air Pollution From Highway Heavy–Duty Engines, 62 Fed. Reg. 54,694, at 54,699 (Oct. 21, 1997).

The third standard governs HHDDE emissions in model years 2007 and beyond. *See* Control of Air Pollution From New Motor Vehicles: Heavy–Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur Control Requirements, 66 Fed. Reg. 5,002 (Jan. 18, 2001). The 2007 Standard, which we upheld in *National Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130 (D.C. Cir. 2002), limits NOx emissions to 0.20 g/bhp-hr and emissions of NMHC to 0.14 g/bhp-hr.

In October 1998 the EPA found manufacturers of the vast majority of HHDDEs sold in the United States were attaching "defeat devices" to their engines. *See United States v. Caterpillar*, 227 F. Supp. 2d 73, 77 (D.D.C. 2002). These devices enabled their engines to meet the 4.0 g/bhp-hr standard in laboratory testing by the EPA, but once disabled resulted in NOx emissions as high as 7.0 g/bhp-hr.

In 1999 the six manufacturers that produce and sell the vast majority of HHDDEs used in the United States entered into Consent Decrees in which they agreed to end this circumvention of the emissions standards. The manufacturers also agreed to produce by October 2002 engines emitting no more than 2.5 g/bhp-hr of NOx plus NMHC. *See Caterpillar*, 227 F. Supp. 2d at 76. This so-called "pull-ahead" provision of the Consent Decrees tracks but is not dependent

upon the 2004 Standard, and would therefore bind the engine manufacturers even if the 2004 Standard were relaxed or rescinded. *See, e.g.,* Caterpillar Consent Decree ¶ ¶ 20, 154, available at http://www.epa.gov/compliance/resources/cases/civil/caa/caterpilall.pdf, January 1, 1999. The engine manufacturers also agreed to be bound by the more stringent emissions limits established for the "steady-state" and "not-to-exceed" testing processes in 40 C.F.R. § 86.007–11, which are otherwise applicable only to engines manufactured in 2007 and beyond. *See, e.g.,* Caterpillar Consent Decree ¶ 20 & App. C. As of January 2003 the EPA had certified 20 "engine families" as complying with the 2.5 g/bhp-hr standard established in the Consent Decrees.

In early 2001 the engine manufacturers petitioned the EPA for a rulemaking to permit manufacturers that could not meet the pull-ahead deadline of October 2002 for a limited time to pay a "nonconformance penalty," as contemplated in 42 U.S.C. § 7525(g). The EPA obliged and set NCPs in August 2002. *See* Non–Conformance Penalties for 2004 and Later Model Year Emission Standards for Heavy–Duty Diesel Engines and Heavy–Duty Diesel Vehicles, 67 Fed. Reg. 51,464 (Aug. 8, 2002).

The Trucking Companies, armed with the data the engine manufacturers had provided to the EPA during the NCP rulemaking, then asked the Administrator to reconsider the 2004 Standard itself. *See* 42 U.S.C. § 7607(d)(7)(B) (requiring the EPA to "convene a proceeding for reconsideration of the rule" if the petitioning party presents an objection "grounds for [which] arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule"). They claimed the cost of complying with the 2004 Standard will be almost six times the EPA's estimate.

The EPA denied the Trucking Companies' petition in February 2003. The Trucking Companies now seek judicial review of that decision on the ground that the EPA's refusal to reconsider the 2004 Standard was arbitrary and capricious,

an abuse of discretion, or otherwise not in accordance with law. *See* 42 U.S.C. § 7607(d)(9)(A).

## II. Analysis

The EPA argues the Trucking Companies lack Article III standing to challenge its decision because, due to the Consent Decrees and the looming 2007 Standard, HHDDE manufacturers will continue to produce engines meeting the 2.5 g/bhp-hr emissions limit even if the 2004 Standard is rescinded. The Trucking Companies respond that they suffer a concrete and particularized injury from the 2004 Standard – increased prices for tractors with engines meeting the 2.5 g/bhp-hr emissions limit – but they completely ignore the EPA's central point about the independent constraint of the Consent Decrees.

\* \* \*

In order to satisfy the "irreducible constitutional minimum of standing," a petitioner must demonstrate: (1) it has suffered (or is about to suffer) an injury-in-fact, that (2) was caused by the conduct of the respondent and (3) would be redressed by the relief sought from the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also City of Waukesha v. EPA*, 320 F.3d 228, 233 (D.C. Cir. 2003). The petitioners' standing must be based upon "specific facts, not 'mere allegations.'" *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 667 (D.C. Cir. 1996) (*en banc*) (quoting *Defenders of Wildlife*, 504 U.S. at 561); *see also Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) ("Bare allegations are insufficient . . . to establish a petitioner's standing to seek judicial review of administrative action").

In order to establish their standing, the Trucking Companies need not demonstrate that if the EPA were to convene a proceeding for reconsideration, then it would relax or rescind the 2004 Standard. *See Defenders of Wildlife*, 504 U.S. at 572 n.7; *Florida Audubon Soc'y*, 94 F.3d at 664. They need only show "a causal connection between" the EPA's failure to convene a proceeding to reconsider the 2004 Standard and

"some reasonably increased risk of [the] injury" the Trucking Companies claim they will suffer, namely, paying higher prices for tractors with HHDDEs. *Florida Audubon Soc'y*, 94 F.3d at 664. To that end the Trucking Companies must show it is "substantially probable" the 2004 Standard is responsible for the increased tractor prices the Trucking Companies will allegedly pay. *Id.* at 665; *see also Sierra Club*, 292 F.3d at 899. Were it not for the Consent Decrees lurking in the background, that would be the work of a minute. Because of the Consent Decrees, however, the Trucking Companies have not established the necessary causal connection between the 2004 Standard and the increased costs they will incur.

The six manufacturers that make the great majority of HHDDEs are subject to consent decrees that independently require them, from October 2002 to January 2005, to produce engines that emit no more than 2.5 g/bhp-hr of NOx plus NMHC. Because repeal of the 2004 Standard, which embodies the same limit, would in no way affect the obligations of the engine manufacturers under the Consent Decrees, the entry of judicial relief favorable to the Trucking Companies would have no effect upon the prices they pay for tractors with HHDDEs made by any of those six companies. *See America West Airlines, Inc. v. Burnley*, 838 F.2d 1343, 1344 (D.C. Cir. 1988) (airline lacks standing to challenge order approving competitors' merger where airline's alleged injury, lack of landing slots, arises from airport rules, not merger). And although engine prices are "very close to the manufacturing cost," Declaration of Steve Duley, V.P. of Purchasing, Schneider National, Inc., at ¶ 3, and it costs less to manufacture an engine that emits more NOx and NMHC, there is no record evidence that any of the Trucking Companies do or would purchase tractors with engines produced by a manufacturer that is not subject to a consent decree. The engines produced by those manufacturers may be inappropriate for the Trucking Companies' use, qualitatively inferior, more expensive to purchase, more expensive to operate, or some combination of the above. In any event, the Trucking Companies present record evidence regarding only one of their number, Schneider National, and omit any explanation why

that company does not purchase tractors with engines from a manufacturer that is not bound by a consent decree or why it would purchase from such a manufacturer in the future. On the contrary, the implication of the Duley affidavit, confirmed at oral argument, is that Schneider buys its tractors with engines made by manufacturers subject to the Consent Decrees, even though – and here the affidavit is express – it must pay a surcharge to cover the cost of meeting the 2.5 g/bhp-hr limitation. *See id.* at ¶ 5.

It is possible, of course, that but for the 2004 Standard, the Trucking Companies will be able to purchase tractors from a manufacturer that is now bound by a consent decree but might, after that constraint expires on January 1, 2005, decide to produce a pre-October 2002 model engine; but that possibility is sheer speculation. Its actualization depends upon a number of predicate facts, including: (1) an engine manufacturer's production and design schedule would permit it to shift from producing a compliant 2005 engine to producing a pre-October 2002 engine, notwithstanding the necessity of meeting yet another standard by January 2007; (2) the expected profit of shifting temporarily from producing 2005 engines to producing 2002 engines would exceed the cost of altering production lines; and (3) the per unit price advantage of 2002 engines would be more than sufficient to offset any non-price advantages associated with the 2005 model so as to induce the Trucking Companies to purchase 2002 engines in 2005. All these things may be true, but there is no record evidence to support any of them.

In this regard, the present case is like *Defenders of Wildlife,* in which the plaintiffs lacked standing to challenge an agency's failure to follow a consultative procedure allegedly required by the Endangered Species Act before providing aid for certain foreign development projects. The United States' contribution was "only a fraction" of the cost of the projects, however, and the plaintiffs "produced nothing to indicate that the projects they have named will either be suspended, or do less harm to listed species, if that fraction is eliminated." 504

U.S. at 571. Likewise, here "it is entirely conjectural whether the nonagency activity" (that is, the engine manufacturers' production decisions) affecting the prices of tractors with HHDDEs "will be altered or affected" should the EPA rescind the 2004 Standard. *Id.; cf. Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 76–77 (1978) (environmental groups have standing to challenge Price-Anderson Act, but for which, evidence shows, company would have withdrawn plans to build nuclear power plants).

The Trucking Companies offer only assertions, not facts, to support their claims about the likely response of engine manufacturers to repeal of the 2004 Standard. That will not do. Speculative and unsupported assumptions regarding the future actions of third-party market participants are insufficient to establish Article III standing. *See Florida Audubon Soc'y*, 94 F.3d at 670 (noting difficulty of establishing standing where it "depends on predicting the acts of even a single 'interest group' who is unrepresented in the instant litigation, especially when that group . . . is actually composed of dozens of individual actors, each of whom must react to other market or regulatory inputs") (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-46 (1976)); *United Transp. Union v. ICC*, 891 F.2d 908, 911-13 (D.C. Cir. 1989) ("[W]e may reject as overly speculative those links which are predictions of future events (especially future actions taken by third parties)"). Without actual evidence of how engine manufacturers would respond to relaxation or rescission of the 2004 Standard – and the Trucking Companies have proffered none – we can not "wade into this morass of marketplace analys[i]s," *Common Cause v. United States Dep't of Energy*, 702 F.2d 245, 252 (D.C. Cir. 1983), and emerge with the conclusion the engine manufacturers would revert to producing pre-October 2002 engines. *See Branton v. FCC*, 993 F.2d 906, 912 (D.C. Cir. 1993) ("A court is rightly reluctant to enter a judgment which may have no real consequence, depending upon the putative cost-benefit analyses of third parties over whom it has no jurisdiction and about whom it has almost no information").

### III.   Conclusion

For the foregoing reasons, the Trucking Companies' petition is

*Dismissed.*