Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 16, 2004          Decided May 14, 2004

No. 03-5169

NATIONAL WRESTLING COACHES ASSOCIATION, ET AL.,
APPELLANTS

v.

DEPARTMENT OF EDUCATION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 02cv00072)

*Lawrence J. Joseph* argued the cause and filed the briefs for appellants.

*Andrew L. Schlafly* was on the brief for *amici curiae* Eagle Forum Education & Legal Defense Fund and Independent Women's Forum in support of reversal. *Lawrence J. Joseph* entered an appearance.

*Thomas M. Bondy*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Peter D. Keisler*, Assistant Attorney General, *Roscoe C. Howard, Jr.*, U.S. Attorney, and *Mark B. Stern*, Attorney.

*Marcia D. Greenberger* and *Dina R. Lassow* were on the brief for *amici curiae* National Women's Law Center, et al. in support of affirmance.

Before: EDWARDS and HENDERSON, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

Dissenting opinion filed by *Senior Circuit Judge* WILLIAMS.

EDWARDS, *Circuit Judge*: Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of sex in federally funded educational programs and activities. That prohibition applies to intercollegiate athletics pursuant to regulations promulgated by the Secretary of Health, Education, and Welfare in 1975. Appellee Department of Education ("Department") is charged with enforcing these provisions. The Department assesses universities' compliance with Title IX and the implementing regulations according to various enforcement policies, including a three-part test first issued in 1979 and clarified in 1996.

Appellants are several membership organizations that represent the interests of collegiate men's wrestling coaches, athletes, and alumni, who claim to have been injured by the elimination of men's varsity wrestling programs at certain universities. In this action for declaratory and injunctive relief, appellants challenge only the three-part test enunciated in the 1979 Policy Interpretation and the 1996 Clarification on the grounds that they violate the Constitution, Title IX, the 1975 regulations, and the Administrative Procedure Act ("APA"). Appellants do not challenge the 1975 regulations or any other regulations promulgated pursuant to Title IX. The District Court granted the Department's motion to dismiss for lack of subject matter jurisdiction, on the grounds that appellants lack standing under Article III of the Constitution. The District Court also rejected on the merits appellants' separate claim under the APA that the Department unlawful-

ly denied their petition for amendment or repeal of the enforcement policies.

We affirm the decision of the District Court in all respects. Appellants' alleged injury results from the independent decisions of federally funded educational institutions that choose to eliminate or reduce the size of men's wrestling teams in order to comply with Title IX. Assuming that this allegation satisfies Article III's injury-in-fact requirement, we hold that appellants nevertheless lack standing because they have failed to demonstrate how a favorable judicial decision on the merits of their claims will redress this injury. The Supreme Court has made it clear that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).

In this case, appellants offer nothing but speculation to substantiate their assertion that a favorable judicial decision would result in schools altering their independent choices regarding the restoration or preservation of men's wrestling programs. Appellants do not contest the constitutionality of Title IX, nor do they challenge the 1975 regulations. Therefore, that legal regime, which requires schools to take gender equity concerns into account when structuring their athletic programs, would remain in place even if the disputed 1996 Clarification and the 1979 Policy Interpretation were revoked. And under that legal regime, schools would still have the discretion to eliminate men's wrestling programs, as necessary, to comply with the gender equity mandate of Title IX. A judicial decision striking down the 1996 Clarification and the 1979 Policy Interpretation would not afford appellants redress sufficient to support standing.

In the alternative, we hold that, even if they have standing, appellants' claims are barred by § 704 of the APA. The availability of a private cause of action under Title IX directly against the universities themselves constitutes an adequate remedy that precludes judicial review under § 704. Finally,

we affirm the District Court's rejection of appellants' claim that the Department unlawfully denied their petition for repeal or amendment of the enforcement policies. Appellants' submissions to the Department cannot be construed as such a petition; and, in any event, the Department's response was not improper.

## I. BACKGROUND

Enacted in response to evidence of "massive, persistent patterns of discrimination against women in the academic world," 118 CONG. REC. 5,804 (1972) (statement of Sen. Bayh), Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of sex in federally funded educational programs and activities. *See* Education Amendments of 1972, Pub. L. No. 92-318, Title IX, §§ 901-907, 86 Stat. 235, 373-75 (codified as amended at 20 U.S.C. § 1681 *et seq.* (2000)). Each federal agency with authority to extend federal financial assistance to an educational program or activity is authorized and directed to ensure the recipient's compliance with Title IX's antidiscrimination mandate through the promulgation of regulations. *See* 20 U.S.C. § 1682. Institutions that fail to comply with Title IX or these regulations face termination of federal funding, though an implementing agency must first attempt to secure voluntary compliance before imposing this ultimate sanction. *See id.* Title IX does not require recipients of federal funding to grant preferential treatment to members of one sex to remedy any disproportion that may exist in the distribution of resources or benefits between sexes, relative to the gender composition of the relevant community. *See* 20 U.S.C. § 1681(b). However, the statute permits the consideration of such an imbalance in enforcement proceedings. *See id.* ("[T]his subsection shall not be construed to prevent the consideration . . . of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.").

In 1974, Congress directed the Secretary of Health, Education, and Welfare ("HEW"), the Department's predecessor agency, to promulgate regulations implementing Title IX in the area of intercollegiate athletics. *See* Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612. As issued in 1975, these regulations prohibit sex-based discrimination in any interscholastic, intercollegiate, club, or intramural athletic program. *See* 45 C.F.R. § 86.41(a) (2003) (subsequently codified at 34 C.F.R. § 106.41(a) (2003)) ("1975 Regulations"). To that end, the regulations require that recipients of federal funding provide "equal athletic opportunity for members of both sexes." 45 C.F.R. § 86.41(c); 34 C.F.R. § 106.41(c). The Department determines whether an institution provides equal athletic opportunities to both sexes by examining, *inter alia*, "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 45 C.F.R. § 86.41(c)(1); 34 C.F.R. § 106.41(c)(1). These regulations were recodified without substantial change in 1980, after HEW's responsibility for implementing Title IX was transferred to the newly organized Department of Education. *See* Department of Education Organization Act, Pub. L. No. 96-88, §§ 301, 505, 93 Stat. 668, 677, 691 (1979) (codified at 20 U.S.C. §§ 3411, 3441, 3505 (2000)); 45 Fed. Reg. 30,802, 30,962 (May 9, 1980).

The dispute in this case concerns a policy interpretation adopted by HEW in 1979 and clarified by the Department in 1996, which provides further guidance as to how the Department assesses compliance with Title IX and the 1975 Regulations. *See* 44 Fed. Reg. 71,413 (Dec. 11, 1979) ("1979 Policy Interpretation"). The Policy Interpretation explains that an institution's compliance with the "interests and abilities" requirement of subsection (c)(1) of the 1975 Regulations will be assessed in part pursuant to a three-part test that asks:

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. 71,413, 71,418 (Dec. 11, 1979) ("Three-Part Test").

In 1996, after notice and a period for comment, the Department issued a clarification to illuminate the Three-Part Test. The Department's Office for Civil Rights ("OCR") then sent a "Dear Colleague" letter to interested parties explaining that the 1996 clarification confirmed that institutions may comply with the Three-Part Test by meeting any one of the three prongs and that the Three-Part Test is only one of many factors the Department examines to assess an institution's overall compliance with Title IX and the 1975 Regulations. *See Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 16, 1996), *transmitted by* Letter from Norma V. Cantú, Assistant Secretary for Civil Rights, Department of Education (Jan. 16, 1996) ("1996 Clarification"), *reprinted in* Joint Appendix ("J.A.") 143-59. In response to inquiries regarding schools' elimination or capping of men's sports teams as a method of compliance, the letter stated:

The rules here are straightforward. An institution can choose to eliminate or cap teams as a way of complying with part one of the three-part test. However, nothing in the Clarification requires that an institution cap or eliminate participation opportunities for men.... Ultimately, Title IX provides

institutions with flexibility and choice regarding how they will provide nondiscriminatory participation opportunities.

*Id.* at 4, J.A. 146.

Appellants, the National Wrestling Coaches Association ("NWCA"), the Committee to Save Bucknell Wrestling, the Marquette Wrestling Club, the Yale Wrestling Association, and the College Sports Council, are membership organizations representing the interests of collegiate men's wrestling coaches, athletes, and alumni. They assert injuries arising from decisions by educational institutions to eliminate or reduce the size of men's wrestling programs to comply with the Department's interpretive rules implementing Title IX, specifically the Three-Part Test.

Appellants do not challenge Title IX itself or the 1975 Regulations. *See* Pls.' Mem. Opp'n Mot. Dismiss at 2, *reprinted in* J.A. 173; Am. Compl. ¶ 66, *reprinted in* J.A. 31; Appellants' Br. at 3, 6; Appellants' Reply Br. at 1; Oral Argument Recording at 1:02:03 (Mar. 16, 2004). As they emphasized throughout their pleadings before the District Court and in their briefs and oral argument before this court, appellants' central premise is that the enforcement policy embodied in the 1979 Policy Interpretation and the 1996 Clarification – *i.e.*, the Three-Part Test – violates the equal protection component of the Due Process Clause of the Fifth Amendment and exceeds the Department's statutory authority by requiring the very same intentional discrimination that Title IX prohibits. Alternatively, appellants claim that the Department's policies amount to an abdication of its duty to enforce Title IX. Appellants further argue that these policy statements violate the 1975 Regulations by replacing that regime of "equal opportunity based on interest," a standard appellants embrace, with a regime of "equal participation based on enrollment," a standard appellants denounce as an impermissible preference in favor of women.

Appellants also allege several procedural infirmities in the 1979 Policy Interpretation and the 1996 Clarification that they argue render these interpretive rules invalid under the

APA and other statutes. Finally, appellants claim that the Department acted unlawfully by denying without explanation a petition filed by NWCA for repeal or amendment of the 1979 Policy Interpretation. Appellants base this claim on two letters NWCA submitted to the Department in October 1995, during the comment period preceding the 1996 Clarification. In their amended complaint, appellants sought declaratory and injunctive relief, asking the District Court to vacate the 1996 Clarification and the Three-Part Test and remand the rules to the Department with instructions to "commence notice-and-comment rulemaking to amend those rules consistent with Title IX, the U.S. Constitution, and [the] Court's declaratory relief in this action." Am. Compl. ¶ 99, J.A. 40.

The Department moved to dismiss appellants' case for, *inter alia*, lack of subject matter jurisdiction, on the grounds that appellants lack standing to pursue these claims. After that motion was briefed and argued before the District Court, appellants sought leave to amend their complaint a second time to add the Secretary of Education and the Assistant Secretary for Civil Rights as defendants in their official capacities and to allege that NWCA includes among its members several unspecified educational institutions. The District Court denied appellants' motion to amend and granted the Department's motion to dismiss, holding that appellants had failed to allege sufficient facts demonstrating their standing and that nothing in the proffered second amended complaint would cure this jurisdictional defect. *See Nat'l Wrestling Coaches Ass'n v. United States Dep't of Educ.*, 263 F. Supp. 2d 82, 104-27 (D.D.C. 2003). The District Court rejected on its merits appellants' APA claim regarding the NWCA petition for repeal or amendment of the 1979 Policy Interpretation. *See id.* at 127-28. This appeal followed.

## II. ANALYSIS

### A. Standing

Appellants' attacks in this lawsuit are aimed solely at the Department's 1979 Policy Interpretation and the 1996 Clarification. They do not challenge Title IX or the 1975 Regula-

tions. Indeed, a central theory of their argument on the merits is that the Department's 1979 and 1996 actions are unlawful, in part, because they violate the statute and the 1975 Regulations. With this context in mind, it is clear that appellants have no standing to pursue this challenge, because they have not demonstrated that their alleged injuries will be redressed by the requested relief. The direct causes of appellants' asserted injuries – loss of collegiate-level wrestling opportunities for male student-athletes – are the independent decisions of educational institutions that choose to eliminate or reduce the size of men's wrestling teams. Appellants offer nothing but speculation to substantiate their claim that a favorable decision from this court will redress their injuries by altering these schools' independent decisions. Absent a showing of redressability, appellants have no standing to challenge the Department's enforcement policies, and we have no jurisdiction to consider their claims.

To satisfy the requirements of Article III standing in a case challenging government action, a party must allege an injury in fact that is fairly traceable to the challenged government action, and "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560-61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)). Where, as here, the plaintiff is an association seeking to sue on behalf of its members, that plaintiff must demonstrate that (1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Accordingly, appellants must establish that at least one of their members has suffered a cognizable injury that is fairly traceable to the Department's Three-Part Test and likely to be redressed by a judicial decision declaring the Three-Part Test to be unlawful and enjoining its use.

Appellants' principal theory of injury is that the Department's interpretive rules harm their member coaches, ath-

letes, and alumni by causing educational institutions to eliminate or reduce the size of men's wrestling teams. Under appellants' view, schools comply with the Three-Part Test not by offering increased athletic opportunities to female students, but by reducing the opportunities available to male students. In support of this theory, appellants point to recent actions by Bucknell, Marquette, and Yale Universities either eliminating their men's wrestling teams or demoting them to non-varsity status. *See* Am. Compl. ¶¶ 50-52, J.A. 27-28. Appellants contend that these schools took these adverse actions in order to satisfy the Three-Part Test, which permits a finding that a school is in compliance with Title IX if, among other things, it offers athletic opportunities to members of both sexes in numbers that are substantially proportionate to the gender composition of the student body as a whole. For example, appellants assert that a press release accompanying Bucknell University's announcement in May 2001 that it would discontinue its intercollegiate wrestling program "cite[d] Title IX's proportionality requirements as Bucknell's reason for eliminating the wrestling team." *Id.* ¶ 50, J.A. 27. Similarly, appellants allege that after Marquette University announced the disbanding of its wrestling program in 2001, the Marquette athletic director made a statement at a dinner party "indicat[ing] that Marquette might bring back its wrestling program if the legal requirements changed." *Id.* ¶ 51, J.A. 27. Finally, appellants allege that when Yale University demoted its intercollegiate varsity wrestling team to club status in 1991 for budgetary reasons, it refused offers of private funding, and, "[o]n information and belief, Yale declined to accept the endowment because of Title IX." *Id.* ¶ 52, J.A. 28.

We review *de novo* the District Court's decision as to standing. *See Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003). Because the District Court disposed of appellants' complaint on a motion to dismiss, we must assume that general factual allegations in the complaint embrace those specific facts that are necessary to support the claim. *See Lujan*, 504 U.S. at 561. Thus, in company with the District Court, we assume

that appellants have stated a cognizable injury-in-fact. Nonetheless, even applying this generous standard of review, we find that appellants' factual allegations are insufficient to establish standing, because appellants have not shown how a favorable decision vacating the 1979 Policy Interpretation and the 1996 Clarification would redress their injuries. *See Warth v. Seldin*, 422 U.S. 490, 504 (1975).

When a plaintiff's asserted injury arises from the Government's regulation of a third party that is not before the court, it becomes "substantially more difficult" to establish standing. *Lujan*, 504 U.S. at 562 (citing *Allen v. Wright*, 468 U.S. 737, 758 (1984)); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-46 (1976); *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 416 (D.C. Cir. 1994). Because the necessary elements of causation and redressability in such a case hinge on the independent choices of the regulated third party, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562. In other words, mere "unadorned speculation" as to the existence of a relationship between the challenged government action and the third-party conduct "will not suffice to invoke the federal judicial power." *Simon*, 426 U.S. at 44.

In several cases, the Supreme Court has made clear that a plaintiff's standing fails where it is purely speculative that a requested change in government policy will alter the behavior of regulated third parties that are the direct cause of the plaintiff's injuries. In *Simon*, for example, organizations representing the interests of low-income persons challenged an IRS Revenue Ruling that allowed favorable tax treatment to nonprofit hospitals that offered only emergency-room services to indigents. *See Simon*, 426 U.S. at 28. The Court held that the plaintiffs lacked standing because their alleged injury – denial of access to certain hospital services – was caused by the regulated hospitals. *See id.* at 40-46. Even accepting the plaintiffs' averment that the IRS's policy encouraged hospitals to provide fewer services to indigents, *id.* at 42 n.23, the Court found it "speculative whether the

desired exercise of the court's remedial powers ... would result in the availability to [the plaintiffs] of such services," *id.* at 43. Rather, "[s]o far as the complaint shed[ ] light, it [was] just as plausible that the hospitals to which [the plaintiffs] may apply for service would elect to forego favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services." *Id.* Accordingly, the Court found that the plaintiffs' complaint was "insufficient even to survive a motion to dismiss." *Id.* at 45 n.25.

Similarly, in *Allen v. Wright*, 468 U.S. 737 (1984), the Court held that parents of Black public school children lacked standing to challenge IRS tax policies toward racially discriminatory private schools. *Id.* at 739-40. The Court found it to be "entirely speculative ... whether withdrawal of a tax exemption from any particular school would lead the school to change its policies." *Id.* at 758. And in *Warth v. Seldin*, 422 U.S. 490 (1975), the Court affirmed the dismissal of plaintiffs' complaint that the defendant town's zoning ordinance effectively excluded persons of low and moderate income from living there. Assuming that the ordinance contributed, "perhaps substantially," to the cost of housing in the town, *id.* at 504, the Court nevertheless found that the plaintiffs failed in their obligation to allege facts showing that they would have been able to buy or rent homes in the town if the Court granted their requested remedy, *id.* The "remote possibility, unsubstantiated by allegations of fact, that their situation ... might improve were the court to afford relief," did not suffice to establish the redressability of the plaintiffs' injuries. *Id.* at 507.

More recently, this court held that an independent, multiracial organization of Republicans lacked standing to challenge the Federal Election Commission's ("FEC") funding of the Republican National Convention on the grounds that the Republican Party's delegate-selection processes discriminated against minority groups. *See Freedom Republicans*, 13 F.3d 412. The court found that, although the level of FEC funding was substantial, the alleged injury was not fairly traceable to any encouragement by the Government and "we [could not] begin to predict" the impact of withdrawal of federal funding

on the Party's decisions as to delegate selection. *Id.* at 418-19.

In this case, appellants offer nothing to substantiate their assertion that a decision from the court vacating the 1979 Policy Interpretation and the 1996 Clarification will redress their injuries by altering schools' independent decisions whether to eliminate or retain their men's wrestling programs. As the Department emphasized when issuing its 1996 Clarification, nothing in the Three-Part Test requires schools to eliminate or cap men's wrestling or any other athletic program. *See* 1996 Clarification at 4, J.A. 146. *This clarification is consistent with the fact that Bucknell and Marquette maintained their men's wrestling programs for decades after the adoption of the Three-Part Test.*

Appellants do not suggest that any particular school necessarily would forego elimination of a wrestling team or reinstate a previously disbanded program in the absence of these interpretive rules, except to say that Marquette University "might bring back its wrestling program if the legal requirements changed." Am Compl. ¶ 51, J.A. 27. Indeed, appellants appear to understand that judicial relief in this case would not afford the remedy that they seek. At oral argument, counsel for appellants candidly said that, if his clients prevail, appellants think they may have "better odds" of retaining their desired wrestling programs. Counsel's candor was admirable, but a quest for ill-defined "better odds" is not close to what is required to satisfy the redressability prong of Article III.

On the record at hand, appellants fall far short of establishing the requisite likelihood that the educational institutions whose choices lie at the root of appellants' alleged injuries will behave any differently with respect to men's wrestling if appellants prevailed on the merits and secured their requested relief. Indeed, in the posture of this case, it is difficult to imagine how appellants could make such a showing. Even if appellants prevailed on the merits in their challenge to the Three-Part Test, Title IX and the 1975 Regulations would still be in place. Federally funded schools would still be

required to provide athletic opportunities in a manner that equally accommodated both genders. *See* 45 C.F.R. § 86.41(c); 34 C.F.R. § 106.41(c). As a consequence, nothing but speculation suggests that schools would act any differently than they do with the Three-Part Test in place. Schools would remain free to eliminate or cap men's wrestling teams and may in some circumstances feel compelled to do so to comply with the statute and the 1975 Regulations. This is particularly so since Title IX itself permits evidence of disproportion in the distribution of benefits between sexes to be considered in enforcement proceedings against recipients of federal funding. *See* 20 U.S.C. § 1681(b). Moreover, other reasons unrelated to the challenged legal requirements may continue to motivate schools to take such actions. *See* Bucknell Univ. News Release (May 2, 2001), *reprinted in* J.A. 573 (explaining that Bucknell's gender equity plan was not only "a matter of federal law," but also "morally . . . the right thing to do").

Appellants' request for a judicial order compelling the Department to undertake notice-and-comment rulemaking to amend its enforcement policies does not alter this analysis. The challenged policies – the 1979 Policy Interpretation and the 1996 Clarification – are interpretive guidelines that the Department was not obligated to issue in the first place. Appellants point to no basis for the notion that the Department would be required to replace the challenged policies with anything new, were the court to invalidate the existing 1979 Policy Interpretation and the 1996 Clarification. And, in any event, appellants do not even challenge the underlying 1975 Regulations, which, as we have noted, clearly permit universities to follow some of the practices that appellants oppose. Accordingly, appellants have failed to establish that it is likely that a favorable decision from the court on the merits of their claims would provide any redress for their alleged injuries.

We recognize that courts occasionally find the elements of standing to be satisfied in cases challenging government action on the basis of third-party conduct. These cases fall into two easily distinguishable categories. First, a federal court may find that a party has standing to challenge govern-

ment action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action. *See Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440-44 (D.C. Cir. 1998) (en banc) ("*ALDF*"); *see also Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009, 1012 (D.C. Cir. 2003); *America's Cmty. Bankers v. FDIC*, 200 F.3d 822, 827-29 (D.C. Cir. 2000); *Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 46-47 (D.C. Cir. 1994). In *ALDF*, for example, we upheld a plaintiff's standing to challenge U.S. Department of Agriculture ("USDA") regulations concerning the treatment of primates by zoos and other exhibitors of animals. *See* 154 F.3d 426. The plaintiff in that case alleged aesthetic injuries that resulted from observing primates living in allegedly inhumane conditions. *See id.* at 429-30. Although this injury resulted from the actions of third parties that chose to maintain their captive primates in such conditions, we held that the plaintiff had standing to challenge the USDA regulations. *See id.* at 438-44. The plaintiff alleged that the regulations permitted exhibitors to maintain primates in inhumane conditions, even though such conduct would have been illegal in the absence of those regulations. *See id.* at 438. Accordingly, a favorable decision would redress the plaintiff's injury because animal exhibitors would no longer be able to keep animals in inhumane living conditions without violating the law. *See id.* at 443. Causation and redressability thus are satisfied in this category of cases, because the intervening choices of third parties are not truly independent of government policy. Moreover, they could only preclude redress if those third parties took the extraordinary measure of continuing their injurious conduct in violation of the law. *See id.* at 441 (citing *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 811 (D.C. Cir. 1983)).

These cases would only support appellants' assertion of standing if appellants took the position that gender-conscious elimination of men's sports teams would be illegal in the absence of the challenged enforcement policies. Appellants make no such claim. As we have emphasized, appellants do not challenge Title IX or the 1975 Regulations; indeed, they

embrace those regulations, which they characterize as properly requiring schools to provide "equal opportunity based on interest." Necessarily, then, they must concede that schools *may* make gender-conscious decisions in order to remedy discrimination and equally accommodate both sexes, in compliance with the statute and regulations. *See* 45 C.F.R. § 86.41(c)(1); 34 C.F.R. § 106.41(c)(1). This includes considering "statistical evidence tending to show that . . . an imbalance exists [between men and women] with respect to the participation in" intercollegiate athletic programs in a school. *See* 20 U.S.C. § 1681(b). Therefore, even if the Three-Part Test were vacated, schools would remain free to take gender into account when designing and funding their athletic programs. The "causation by authorization" theory of this first category of cases thus lends no support to appellants' claim of standing.

Second, some cases have held that plaintiffs have standing to challenge government action on the basis of injuries caused by regulated third parties where the record presented substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress. In *Tozzi v. United States Department of Health & Human Services*, 271 F.3d 301 (D.C. Cir. 2001), for example, a manufacturer of medical supplies made of PVC plastic challenged a decision by the Secretary of Health and Human Services to add the chemical dioxin to the category of "known" carcinogens. The manufacturer alleged that the decision harmed its business reputation and profits, because concern over the dioxin hazards associated with the incineration of PVC plastic deterred the manufacturer's customers from purchasing its products. *See id.* at 307-08. We held that the manufacturer had standing. *See id.* at 308-10. The record left "little doubt" that the Government's authoritative statement regarding the carcinogenicity of dioxin was a substantial factor motivating the decisions of the third parties that were the direct source of the plaintiff's injuries. *See id.* at 308-09. Specifically, the plaintiff introduced affidavits and other record evidence demonstrating that municipalities and health care organizations

opted to phase out their use of PVC plastic as a direct result of the Secretary's decision. *See id.* Moreover, the court noted that "[w]hen the government attaches an inherently pejorative and damaging term such as 'carcinogen' to a product, the probability of economic harm increases exponentially." *Id.* at 309. Based on this record evidence, the court found it "not at all 'speculative'" that the addition of dioxin to the list of known carcinogens caused municipalities and companies to reduce or end their use of PVC plastic, and that a decision setting aside the Government's action likely would prevent that result. *Id.* at 309-10.

Similarly, in *Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986), we held that a film distributor had standing to challenge a decision by the Government to classify as "political propaganda" certain films that the plaintiff wished to distribute. The plaintiff alleged that the government action harmed his economic interests, because potential customers would no longer purchase the films from the plaintiff, thus reducing his company's profits. *Id.* at 1308. In support of this claim, the plaintiff submitted several declarations and affidavits detailing specific instances in which potential customers declined to take the films because of the classification. *See id.* The court found these factual assertions to be sufficient to establish harm that was attributable to the Government's action. *See id.* at 1308-09; *see also Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 457-58 (D.C. Cir. 1998) (finding that the petitioner had standing to challenge government action based on the independent conduct of third parties where evidence demonstrated that the challenged action "resulted in an almost unanimous decision" by those third parties to take action that harmed the petitioner); *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 113-18 (D.C. Cir. 1990) (finding "overwhelming evidence" in the administrative record to support a conclusion that third parties' decisions were not substantially independent of the challenged government action and that those third parties were likely to alter their behavior in response to favorable judicial action).

Appellants' reliance in this case on the *possibility* that their members may have "better odds" of retaining their desired wrestling programs plainly falls far short of the mark set by *Tozzi* and other such cases. The cases on which appellants rely require "formidable evidence" of *causation, see Freedom Republicans*, 13 F.3d at 418 (distinguishing *Women's Equity Action League v. Cavazos*, 879 F.2d 880 (D.C. Cir. 1989)). With such evidence, the court is easily able to discern redressability. There is no such evidence in this case.

While our discussion thus far has emphasized the lack of redressability in appellants' complaint, appellants' submissions similarly fail to demonstrate that causation is so clear that redressability inexorably follows. For example, appellants' amended complaint cited a press release in which Bucknell University announced the elimination of its men's wrestling team – some 22 years after the adoption of the Three-Part Test – and cited gender proportionality as one reason for its decision. *See* Am. Compl. ¶ 50, J.A. 27. That same press release, however, also cites the absence of league sponsorship for wrestling, budgetary concerns, and the need to balance the athletic program with other University priorities as other factors contributing to the decision. *See* Bucknell Univ. News Release (May 2, 2001), J.A. 573-78.

Appellants also rely on a report issued by the General Accounting Office ("GAO") in March 2001, discussing the experiences of four-year colleges in adding and discontinuing men's and women's athletic teams between 1981 and 1999. *See* GEN. ACCOUNTING OFFICE, INTERCOLLEGIATE ATHLETICS: FOUR-YEAR COLLEGES' EXPERIENCES ADDING AND DISCONTINUING TEAMS (2001), *reprinted in* J.A. 366-81. This report does not advance appellants' case. First, although the GAO found evidence that numerous men's athletic teams were eliminated over the period covered in the study – 519 teams discontinued between the 1981-82 and 1998-99 academic years, to be precise – the GAO also found that even more new men's teams were created in that same time-frame (555 men's teams between the 1981-82 and 1998-99 years). *See id.* at 13, J.A. 372. What is more telling, however, is that the GAO's discussion of the role that gender equity concerns played in

schools' decisions to add or eliminate teams, upon which appellants rely heavily, is utterly inconclusive as to whether the Three-Part Test caused the elimination of any men's athletic teams. The GAO notes that a majority of surveyed schools cited "gender equity considerations" as an influential factor in their decisions to discontinue men's teams. *Id.* at 20, J.A. 379. The report does not define "gender equity concerns." We do not know, on the basis of this report, whether these concerns are self-imposed or legally required. To the extent they reflect legal requirements, we do not know whether they refer to the Three-Part Test or to Title IX and the 1975 Regulations, which appellants do not challenge. Finally, the GAO also found that several other factors also contributed to schools' decisions as much or more than "gender equity considerations," including levels of student interest and limits on funding and other resources. *See id.*

Recently, in *Crete Carrier Corp. v. Environmental Protection Agency*, 363 F.3d 490 (D.C. Cir. 2004), operators of five large-haul truck fleets challenged the Environmental Protection Agency's refusal to reconsider the 2004 Standard for nitrous oxide and nonmethane hydrocarbon emissions from " 'heavy heavy-duty' " diesel engines. Because the trucking companies failed to show that their injury was fairly traceable to the 2004 Standard, the court dismissed their petition for lack of standing under Article III. In reaching this conclusion, the court held:

> The Trucking Companies offer only assertions, not facts, to support their claims about the likely response of engine manufacturers to repeal of the 2004 Standard. That will not do. Speculative and unsupported assumptions regarding the future actions of third-party market participants are insufficient to establish Article III standing. Without actual evidence of how engine manufacturers would respond to relaxation or rescission of the 2004 Standard – and the Trucking Companies have proffered none – we can not "wade into this morass of marketplace analys[i]s," and emerge with the conclusion the en-

gine manufacturers would revert to producing pre-October 2002 engines.

*Id.* at 494 (internal citations omitted). Appellants in this case face the same problem. They have offered nothing but "unadorned speculation" to suggest that the schools covered by Title IX would change their decisions if appellants were to prevail in this case.

*Tozzi* and *Block* offer no solace for appellants, for causation in those cases was clear. There is nothing in *Tozzi* and *Block* indicating that the third parties whose conduct injured the plaintiffs would have had reason to continue their injurious conduct unaltered in the absence of the challenged government action. In this case, by contrast, the continued vitality of Title IX itself and the 1975 Regulations means that schools must continue to take gender equity into account when designing their athletic programs. And appellants have offered nothing to indicate that the schools will act any differently than they have in the past regarding decisions to comply with Title IX.

The case law makes clear that one need not adopt the view that a challenged government policy is totally ineffectual to find that the likelihood of redress is too speculative to confer standing upon a plaintiff. Surely, in *Simon*, it would not have been implausible to hypothesize that the potential loss of a valuable tax exemption might affect hospitals' decisions regarding treatment of the indigent. Indeed, the Court accepted the plaintiffs' assertion in that case that the challenged IRS tax policy encouraged hospitals to provide fewer services to indigents. *See Simon*, 426 U.S. at 42 n.23. Similarly, in *Freedom Republicans*, it would not have been beyond the pale to assume that the Republican Party might alter its convention policies if it faced termination of its substantial public funding, and the court accordingly acknowledged that the Party "would inevitably face a problem if its funding, but not that of the Democrats, were to be withdrawn." *Freedom Republicans*, 13 F.3d at 419. Abstract theory and conjecture are not enough to support standing, however. The Supreme Court has repeatedly rejected the notion that a finding of

standing may be based on such "unadorned speculation." *Simon*, 426 U.S. at 44.

In sum, appellants' allegations of causation are far from persuasive. If causation were the only issue in this case, appellants' proffers might be adequate to survive a motion to dismiss. The problem here is that appellants have failed completely to satisfy the redressability prong of Article III standing, for there is nothing to support appellants' claim that a favorable ruling would alter the schools' conduct. To survive a motion to dismiss, a plaintiff "must allege facts from which it reasonably could be inferred that, absent the [challenged policy], there is a substantial probability that . . . if the court affords the relief requested, the asserted [injury] will be removed." *Warth*, 422 U.S. at 504. Appellants' attempts to show redressability are based on nothing but "unadorned speculation."

To avoid these difficulties, plaintiffs turn to the "unequal footing" theory of standing underlying the Supreme Court's decisions in *Gratz v. Bollinger*, 123 S. Ct. 2411, 2422-23 (2003), and *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210-12 (1995). Under the holdings of these decisions, when a plaintiff challenges a competitive process, such as university admissions or contract bidding, on the grounds that discrimination in the process prevents the plaintiff from competing on equal footing, the plaintiff need not demonstrate that, but for the discrimination, he would have gained admission to the university or won the contract. *See Gratz*, 123 S. Ct. at 2423; *Adarand*, 515 U.S. at 211. Rather, a plaintiff obtains redress in such a case because a favorable court decision eliminates the discrimination that tainted the process and permits competition on an equal basis.

These "unequal footing" cases are inapposite here. In both *Gratz* and *Adarand*, the challenged policies *directly* injured the plaintiffs, without any intervening, third-party decision maker. Accordingly, these cases do not resolve the difficulties appellants face as a result of the role of third parties in causing their alleged injuries. In this case, by contrast, it is purely speculative whether a decision in appellants' favor

would alter the process by which schools determine whether to field certain sports teams. Even if the court invalidated the Department's Three-Part Test, schools might nevertheless continue to eliminate or cap men's wrestling teams in order to comply with Title IX or the 1975 Regulations, or for some other unrelated reason. Save for their speculation about "better odds," appellants would be no better off than they are under the Department's current policies.

Appellants' remaining theory of standing likewise lacks merit. Appellants claim that the regulations compel their member coaches and athletic directors to act as "involuntary participants" in illegal discrimination. An "involuntary participant," however, has standing only to the extent that the victims of the alleged discrimination themselves have standing. *See Fraternal Order of Police v. United States*, 152 F.3d 998, 1002 (D.C. Cir. 1998) ("[W]here a person is effectively used by the government to implement a discriminatory scheme, he may . . . attack that scheme by raising a third party's constitutional rights.") (internal quotation marks and citations omitted); *see also Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 350 (D.C. Cir. 1998). As we have discussed at length, the alleged victims of the alleged discrimination – *i.e.*, the male student-athletes and coaches that appellants represent – lack standing in their own right. The "involuntary participant" theory cannot confer standing upon appellants that these student-athletes and coaches do not independently possess.

As a final matter, the District Court did not abuse its discretion in denying appellants' request for leave to amend their complaint a second time, because none of the allegations in the proffered second amended complaint supply the missing elements of appellants' standing. The court of appeals reviews a district court's denial of a motion for leave to amend for abuse of discretion, "requiring only that the court base its ruling on a valid ground." *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996). While leave to amend "shall be freely given when justice so requires," FED. R. CIV. P. 15(a), a district court has discretion to deny a motion to amend on grounds of futility where the proposed

pleading would not survive a motion to dismiss, *see James Madison Ltd.*, 82 F.3d at 1099.

Here, as the District Court found, the proposed amendment would be futile, because none of the allegations in the second amended complaint suffice to demonstrate appellants' standing. The inclusion of the Secretary of Education and the Assistant Secretary for Civil Rights as defendants in their official capacities adds nothing to appellants' assertion of standing. The addition of unspecified educational institutions as members of the NWCA likewise does not alter the analysis. While a federally funded school might, in an appropriate case, have standing in its own right to challenge the Department's regulations, appellants' second amended complaint does not allege with any specificity how any particular member school has been injured by the regulations. *See* Second Am. Compl. ¶¶ 4, 63-64, *reprinted in* J.A. 538, 552. Because the proposed pleading would not survive a motion to dismiss for lack of standing, the District Court did not abuse its discretion in denying as futile appellants' motion for leave to amend their complaint. *See James Madison Ltd.*, 82 F.3d at 1099.

Appellants have no Article III standing. We therefore affirm the District Court's dismissal of appellants' claims for lack of jurisdiction.

## B. Adequate Remedy

In the alternative, even if appellants had standing to pursue these claims, the availability of a private cause of action directly against universities that discriminate in violation of Title IX constitutes an adequate remedy that bars appellants' case. Section 704 of the APA subjects to judicial review "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (2000). In *Cannon v. University of Chicago*, 441 U.S. 677 (1979), the Supreme Court held that plaintiffs have a private cause of action for sex discrimination under Title IX against universities.

Following *Cannon*, in *Washington Legal Foundation v. Alexander*, 984 F.2d 483 (D.C. Cir. 1993), this court considered a challenge to the Department's implementation of Title

VI of the Civil Rights Act of 1964. The plaintiffs in that case asserted an APA cause of action to compel the Department to enforce Title VI against universities that allegedly offered certain scholarships only to minority students. *See id.* at 486. Applying the Title IX holding of *Cannon* in the parallel regime of Title VI, the court held that plaintiffs' alternative remedy – proceeding directly against the individual universities – precluded any suit against the Department under the APA. *See id.* Under *Washington Legal Foundation*, appellants' claims against the Department are plainly barred. *See also Women's Equity Action League v. Cavazos*, 906 F.2d 742, 750-51 (D.C. Cir. 1990); *Council of and for the Blind v. Regan*, 709 F.2d 1521, 1531-33 (D.C. Cir. 1983) (en banc).

Appellants argue that the Supreme Court's decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), alters this result. We disagree. *Sandoval* held that private individuals have no implied cause of action to enforce *disparate-impact regulations* promulgated under Title VI of the Civil Rights Act, which prohibits only intentional discrimination. *See id.* at 278-93. In a notably strained argument, appellants claim that *Sandoval* effectively eliminates the implied cause of action, recognized in *Cannon*, to enforce the prohibition on *intentional discrimination* that derived from the statute itself. Appellants thus contend that they no longer have any cause of action against the universities, and, consequently, there is no alternate remedy precluding their suit under the APA.

*Sandoval* does not purport to overrule *Cannon*'s allowance of a cause of action to enforce the statutory prohibition against intentional discrimination under Title IX. Thus, the cause of action recognized in *Cannon* remains viable. *See id.* at 279-81. That is fatal to appellants' claims here. In this case, appellants do not seek to enforce disparate-impact requirements that go further than the facial requirements of the statute itself, as was the posture in *Sandoval*. Rather, to the extent that they view the Three-Part Test as embodying a disparate-impact requirement, they seek to eliminate that policy as inconsistent with the statute's ban on intentional discrimination. In other words, the only policy appellants

wish to enforce in this case is the prohibition against intentional discrimination and the equal opportunity requirements found in Title IX and the 1975 Regulations. *Sandoval* explicitly recognized in its discussion of *Cannon* that such a cause of action against the universities remains available to appellants. *See id.*

5 U.S.C. § 704 says that a cause of action may arise under the APA for "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." Seeking to avoid the "adequate remedy" limitation of § 704, appellants argue that the Department's interpretive policies constitute "[a]gency action made reviewable by statute." This argument is plainly foreclosed by the court's decision in *Washington Legal Foundation. See* 984 F.2d at 486. Appellants in *Washington Legal Foundation* contended that they had an APA cause of action against the Department of Education because the Government failed to enforce Title VI against schools that reserved scholarship funds solely for minority students. The court held that appellants' APA cause of action was barred by § 704, because of the availability of an adequate alternative remedy in the form of an implied right of action under Title VI. *Id.* at 486.

In this case, as in *Washington Legal Foundation*, there is no legislation pursuant to which agency actions under Title IX are made reviewable by statute. The reference to agency actions "made reviewable by statute" in § 704 relates to statutory provisions *other than the APA* that govern judicial review of those actions. When pressed, appellants could point to no such provisions that apply in this case. Therefore, even assuming, *arguendo*, that appellants could demonstrate standing, the "adequate remedy" provision under § 704 would still bar their APA claim. *See id.* at 486.

Appellants next attempt to evade the limitation in § 704 by advancing assorted non-statutory causes of action, which they variously characterize as an *ultra vires* claim, an equitable claim, or a claim in the style of *Leedom v. Kyne*, 358 U.S. 184 (1958). Without delving into their particulars, we find that these alternatives fail. Even under these theories, appellants

must depend on the waiver of sovereign immunity in § 702 of the APA, which applies to any suit, whether advanced under the APA or not. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not."). However, the waiver of sovereign immunity under § 702 is limited by the "adequate remedy" bar of § 704. *See Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 607 (D.C. Cir. 1992) ("The APA excludes from its waiver of sovereign immunity . . . claims for which an adequate remedy is available elsewhere."). The availability of a private cause of action under Title IX directly against the universities thus bars appellants' assertion of non-APA causes of action, because there is no waiver of sovereign immunity where appellants have an adequate alternative remedy in court.

Appellants also argue that a suit against a university that eliminates its men's wrestling team cannot provide an "adequate remedy" for the alleged unlawfulness of the Department's enforcement policies. In a suit against a university, they contend, they would not be able to air their challenges to the Three-Part Test, particularly their claim that the Department has abdicated its duty to enforce Title IX. Again, however, appellants cannot escape the import of our holding in *Washington Legal Foundation*, which rejected a similar argument. *See* 984 F.2d at 486-88. As that case held, even if the "adequate remedy" limitation were not an obstacle, no abdication claim is available where appellants do not allege that the Department has continued to fund an institution specifically found to be in violation of Title IX. *See id.* at 487-88 (distinguishing *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973)); *see also Ass'n of Civilian Technicians v. FLRA*, 283 F.3d 339, 344 (D.C. Cir. 2002). Here, appellants make no such allegations.

In any event, the experience in our sister circuits demonstrates that challenges to the lawfulness of the Department's policies in fact may be aired in a suit against a university, to the extent that the defendant university attempts to justify its actions by reference to those policies. *See, e.g.*, *Neal v.*

*Bd. of Trs. of the Cal. State Univs.*, 198 F.3d 763, 766-73 (9th Cir. 1999); *Kelley v. Bd. of Trs.*, 35 F.3d 265, 270-72 (7th Cir. 1994); *see also Cohen v. Brown Univ.*, 991 F.2d 888, 899-901 (1st Cir. 1993). In these and other cases, parties have had the opportunity to litigate the propriety of the Department's Three-Part Test under the Constitution, Title IX, the 1975 Regulations, and principles of administrative law. Our holding today thus does not prevent appellants from obtaining review of their claims on the merits, when raised in a judicially reviewable case or controversy.

Appellants finally contend that a suit against a university is an inadequate alternative because it would not permit them to obtain a judicial order compelling the Department to initiate a new rulemaking to replace the Three-Part Test. As we noted in our discussion of standing, however, the Three-Part Test is an interpretive guideline that the Department was never obligated to issue in the first place. Appellants again fail to point to any authority suggesting that the Department would be required to develop a new interpretive rule in the event the court invalidated the Three-Part Test.

Accordingly, we hold that, even if appellants had standing to challenge the Department's enforcement policy, their case would be barred by the "adequate remedy" limitation of § 704 of the APA.

### C. Petition to Repeal or Amend

Finally, we affirm the decision of the District Court rejecting appellants' claim that the Department unlawfully denied NWCA's petition to amend or repeal the Three-Part Test. Section 553(e) of the APA requires agencies to give interested parties the right to petition for the issuance, amendment, or repeal of a rule. *See* 5 U.S.C. § 553(e) (2000). Section 555(e) further provides that an agency shall give prompt notice and a brief explanation of the grounds for the denial of such a petition. *See* 5 U.S.C. § 555(e). In October 1995, after the Department solicited comments on its proposed clarification of the Three-Part Test, appellant NWCA submitted two letters to the Department expressing its dissatisfaction with the Three-Part Test. *See* J.A. 160-66. The letters requested

no specific action, but stated that if the Department did not "clarify [its policies] in a manner which permits male sports programs and athletes to survive, [NWCA] will be forced to seek additional hearings and remedial legislation." Letter from T.J. Kerr, President, NWCA, to Norma V. Cantú, Assistant Secretary for Civil Rights, Department of Education, at 5 (Oct. 20, 1995), *reprinted in* J.A. 164. Appellants contend that these letters constituted a petition for repeal or amendment of the Three-Part Test and that the 1996 Clarification effectively denied that petition without explanation.

Leaving aside any difficulties as to whether the Three-Part Test is the type of policy subject to the APA's petition requirements, NWCA's 1995 letters simply cannot be construed as a petition for repeal or amendment. The letters described problems NWCA perceived in the existing regulatory scheme under Title IX, but requested no particular action by the Department. We therefore agree with the Department that it was under no obligation to treat the letters as a valid petition. Indeed, the District Court noted that appellants subsequently filed a proper petition that remained pending before the Department when the District Court issued its decision, apparently conceding the infirmity of their previous correspondence. *See Nat'l Wrestling Coaches Ass'n*, 263 F. Supp. 2d at 128.

Furthermore, the Department's 1995 solicitation for comments clearly confined its request to whether the proposed clarification of the Three-Part Test "provide[d] the appropriate clarity in areas that have generated questions." *See Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test*, at 1 (Sep. 20, 1995), *transmitted by* Letter from Norma V. Cantú, Assistant Secretary for Civil Rights, Department of Education, *reprinted in* J.A. 131. And, as the 1996 Clarification reiterated, the Department did not intend the 1995-96 proceeding to serve as a forum for reconsideration of the Three-Part Test. *See* 1996 Clarification, J.A. 143. In light of the Department's broad discretion to manage its docket, *see Edison Elec. Inst. v. ICC*, 969 F.2d 1221, 1230 (D.C. Cir. 1992), and the "quite limited" scope of our review of an agency's decision whether to repeal a rule,

*see Nat'l Mining Ass'n v. United States Dep't of the Interior*, 70 F.3d 1345, 1352 (D.C. Cir. 1995), it cannot be said that the Department failed to provide an adequate explanation for its disposition of NWCA's 1995 letters.

In sum, appellants did not petition for repeal or amendment of the Three-Part Test pursuant to the Department's solicitation of comments on its proposed clarification of the test. Nor would such a petition have been within the scope of the 1995-96 proceeding. The proceeding was undertaken by the Department solely to determine whether the proposed clarification of the Three-Part Test provided clarity in areas that had generated questions, not as a forum for reconsideration of the Three-Part Test. Appellants' subsequent petition for repeal or amendment of the Three-Part Test is still pending and thus is not ripe for review in this litigation.

## III. CONCLUSION

We affirm on the merits the District Court's rejection of appellants' claim that the Department unlawfully denied their petition to amend or repeal the Three-Part Test. As to their remaining claims, we hold that appellants lack standing under Article III. Finally, even assuming, *arguendo*, that the requirements of Article III standing have been met, appellants' case would be barred by the "adequate remedy" limitation of § 704 of the APA.

1

WILLIAMS, *Senior Circuit Judge*, dissenting: The majority finds that plaintiffs do not have standing to maintain their suit. Because I believe our precedents require a different result, I dissent.

\* \* \*

Plaintiffs consist of two types of associations—national associations of persons (including coaches) with interests in wrestling or other college sports, and associations of alumni, student athletes and others committed to advancing wrestling at specific universities (Bucknell, Marquette and Yale). Their complaint is that the defendant Department of Education has unlawfully enforced Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, in a way that has caused a reduction in opportunities for participation in men's sports, especially wrestling. They say that the Department has pressured colleges to achieve women's participation in sports proportional to women's enrollment, without regard to varying levels of interest or skill. As colleges have competing demands on their resources, cutting men's teams is one of the obvious ways for them to meet the Department's measure of proportionality. And cut they have. Plaintiffs cite a report by the General Accounting Office, "Intercollegiate Athletics: Four–Year Colleges' Experience Adding and Discontinuing Teams" (March 2001) ("GAO Report"), saying that schools had cut 519 men's teams between 1981–82 and 1998–99, including 171 wrestling teams. GAO Report at 18. Of the 272 responding schools that had cut a men's team in the period 1992–93 to 1999–2000 (see *id.* at 33), 31% cited the need to meet gender equity goals or requirements. *Id.* In the face of these data, the district court found that plaintiffs had failed to allege facts showing any causal connection between the Department's actions and the reduction in plaintiffs' members' coaching opportunities, and thus found them without standing. This was error.

\* \* \*

Plaintiffs point to two documents setting forth the Department's interpretation of Title IX: "Title IX of the Education

Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics," 44 Fed. Reg. 71,413 (December 11, 1979) (codified at 45 C.F.R. pt. 86) (the "1979 Policy Interpretation"), and a statement issued by the Assistant Secretary for Civil Rights, "Clarification of Intercollegiate Athletics Policy Guidance: The Three–Part Test" (January 16, 1996) (the "1996 Clarification"). The 1979 Interpretation sets forth what has come to be known as the "Three–Part Test":

a. Compliance will be assessed in any one of the following ways:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a history and continuing practice of program expansion, as described above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

1979 Interpretation, 44 Fed. Reg. at 71,418. At oral argument government counsel confirmed that, as the context suggests, "underrepresented" as used in paragraphs (2) and (3) means simply that women's sports participation fell below men's as a proportion of enrollment. Plaintiffs say that, especially with the 1996 Clarification, the Department has made the enrollment proportionality "prong" of the test into a "safe harbor" for compliance, see January 16, 1996 letter of Norma V. Cantú at 2 ("Cantú letter") (explaining 1996 Clarification), and has ruled that it will count "actual athletes"—not unfilled spots on teams—when it assesses the "proportionality

of participation opportunities," *id*. at 4. See First Amended Complaint ¶¶ 44–45. The government at no point contends that the legal provisions that plaintiffs do *not* challenge—Title IX itself or the regulations antedating the 1979 Interpretation or the 1996 Clarification, i.e., the regulations adopted in 1975, 44 Fed. Reg. 24,128 (June 4, 1975) (now codified at 34 C.F.R. § 106.41(a) (2003))—either mandate proportionality by reference to enrollment or create a safe harbor based on such proportionality. (Such a claim would be a merits argument in any event.)

Incurring Departmental displeasure under the Interpretation and the Clarification is not something an educational institution would do lightly. The Department is empowered to cut off *all* federal funds from non-complying colleges and universities. See 20 U.S.C. § 1682 (authorizing each federal department and agency that extends federal financial assistance to any education program or activity to terminate funding in order to effectuate the provisions of Title IX); *id.* § 1687 (defining "program or activity" to include "all the operations of ... (2)(A) a college, university, or other postsecondary institution, or a public system of higher education"); 45 C.F.R. § 86.2(g) (defining federal financial assistance); see also 44 Fed. Reg. at 71,418–19 ("When a recipient is found in noncompliance and voluntary compliance attempts are unsuccessful, the formal process leading to termination of Federal assistance will be begun."). That gives the Department substantial influence over college and university policies: federal support for postsecondary education totaled over $119 billion in 2000, well over 40% of the nearly $278 billion spent by all postsecondary institutions that year. See National Center for Education Statistics, Digest of Education Statistics 2002 at Tables 343–46 and 363.

Plaintiffs claim that in implementing the Interpretation and the Clarification the Department has "initiated hundreds of administrative enforcement actions and investigations" and "negotiated settlements with such institutions that reduced male participation opportunities." First Amended Complaint ¶ 48. "As a direct and indirect result of [the Department's] unlawful Title IX policies, therefore, institutions have cut (*i.e.*,

eliminated) hundreds of men's teams and have capped (*i.e.*, arbitrarily limited) hundreds of men's participation opportunities." *Id.* They cite the GAO Report's finding in support. *Id.*

As the standing issue arose on a motion to dismiss, the plaintiffs' burden is simply to make the requisite *allegations*. "At the pleading stage, general factual allegations . . . may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citation omitted). See also *Bennett v. Spear*, 520 U.S. 154, 171 (1997) (calling burden of allegation at the pleading stage "relatively modest"); *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 260–61 (1977); *Warth v. Seldin*, 422 U.S. 490, 501 (1975). Dismissal for want of subject matter jurisdiction should occur only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Empagran S.A. v. F. Hoffman–LaRoche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)). Interestingly, the leading cases in our circuit finding standing on the basis of third parties' response to alleged excessive agency stringency, *Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986) (Scalia, J.), and *Tozzi v. United States Dep't of Health and Human Servs.*, 271 F.3d 301 (D.C. Cir. 2001), discussed below in detail, involved motions for summary judgment; despite the far more demanding standard appropriate there, we found the requisite causality and redressability.

The plaintiffs are all associations, and there is no question (nor, so far as appears, any basis for questioning) that they meet the requirements for associational standing other than the disputed question of whether the members would have standing to sue in their own right. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (requiring that the interest advanced be germane to association's purpose and that neither the claim nor the relief would need participation of individual members).

Two of the associations represent collegiate coaches. The National Wrestling Coaches Association represents collegiate wrestling coaches, and the College Sports Council represents national collegiate coaches associations for men's and women's swimming, men's and women's track and field, men's wrestling and men's gymnastics. First Amended Complaint ¶¶ 4, 8. The three college-specific associations represent alumni and student athletes and the complaint alleges that they have "participatory and spectator interests" in their respective schools' wrestling programs. Id. ¶¶ 5–7. With respect to Bucknell, the complaint alleges that the members of the association include "underclassmen on Bucknell's 2001–02 wrestling team who want to wrestle for Bucknell in the 2002–03, 2003–04, and 2004–05 academic years." *Id.* ¶ 5; see also Second Amended Complaint ¶ 5 (naming a specific Bucknell wrestler). While the plaintiffs' allegations of redressability—discussed below—may be insufficient as to the three college-specific associations, compare *Defenders of Wildlife*, 504 U.S. at 564–67, the suit may proceed if any plaintiff has standing, see, e.g., *Community for Creative Non–Violence v. Pierce*, 814 F.2d 663, 666 (D.C. Cir. 1987), as I believe is true for the coaches seeking to advance their professional and economic interests.

Of the three familiar requirements for Article III standing—(1) a concrete, actual or imminent injury-in-fact, (2) causation and (3) redressability, see *Defenders of Wildlife*, 504 U.S. at 560–61—any dispute over "injury" appears to completely overlap the issue of causation. Thus the district court, though finding the complaint defective as to causation and redressability, also found that "it is conceivable that coaches in particular potentially suffer a direct economic harm through loss of employment if, as plaintiffs allege, the challenged regulations lead educational institutions to cut men's teams." *National Wrestling Coaches Ass'n v. United States Dep't of Educ.*, 263 F. Supp. 2d 82, 106–07 (D.D.C. 2003) ("*NWCA*"). The deprecatory phrase "it is conceivable" foreshadows the court's later decision on the two other requirements, to which I now turn.

*Causation*

In finding that the plaintiffs had not met their burden on causation, see *NWCA*, 263 F. Supp. 2d at 112–14, the district court stressed that even in the absence of the Department's rules and enforcement policy an educational institution would have discretion to eliminate men's teams, *id.* at 112, 113. Because of the presence of other factors in the institutions' decisionmaking—such as resource distribution, competitiveness, and spectator interest—the district court concluded that "it cannot be held . . . that the Three Part Test and 1996 Clarification . . . so *controls* [sic] the conduct of third parties as to confer standing on plaintiffs." *Id.* at 114 (emphasis added).

Despite use of the verb "control," the district court recognized that where an injury turns on a third party's response to government regulations, the law requires only that those regulations have constituted a "substantial factor" in the third party's decisionmaking. See *Community for Creative Non–Violence*, 814 F.2d at 669. See also *Competitive Enter. Inst. v. National Highway Traffic Safety Admin.*, 901 F.2d 107, 113 (D.C. Cir. 1990) (requiring "substantial likelihood of the alleged causality"). A factor can obviously play a substantial role without "control[ling]." Compare Maj. Op. at 19 (rejecting causality because "other factors" contributed to the schools' decisions).

The complaint clearly alleges that the Department regulations and policies represented a "substantial factor" in educational institutions' decisions on the number and composition of sports teams. Paragraph 48 of the First Amended Complaint says that either as a direct result of the Department's enforcement action or in order to avoid becoming the target of such action, educational institutions "have limited male participation opportunities to comply with [the Department's] unlawful Title IX policies," and that as a result of these policies institutions "have cut (*i.e.*, eliminated) hundreds of men's teams and have capped (*i.e.*, arbitrarily limited) hundreds of men's participation opportunities." The First Amended Complaint (¶ ¶ 50–52) also specifically alleges that

wrestling teams at Bucknell, Marquette and Yale were eliminated in order to comply with the Department's Title IX policies.

This explicit allegation of the institutions' behavior and the Department's causal role is enough to reject the government's motion to dismiss under the principles laid out in the cases cited above—*Defenders of Wildlife*, *Warth v. Seldin* and *Empagran*. The majority's repeated insistence that the plaintiffs "demonstrate" the causal relation has no place in the inquiry. Compare Maj. Op. at 3, 18.

In fact, however, plaintiffs added more, offering the GAO Report as support. Summarizing extensive data gathering, it said that of 272 schools that cut a men's team, 83 (31%) cited the need to meet gender equity goals or requirements for their decision. GAO Report at 18. Among NCAA Division I–A schools, a clear majority (54%) cited gender equity considerations as a significant motivating factor in cutting a men's team. *Id.* at 20. The Report also lists changes in the number of men's teams between 1981–82 and 1998–99, including: 171 fewer wrestling teams, 56 fewer gymnastics teams, 27 fewer outdoor track teams and 25 fewer swimming teams. *Id.* at 13.

The majority notes that more men's teams were created than destroyed in the relevant period, see Maj. Op. at 18, erroneously suggesting that the relevant benchmark is the starting date. But the question is the effect of the Department's rules, so the proper benchmark is the expected growth of men's teams under a regime that did *not* demand enrollment proportionality. See *Competitive Enter. Inst. v. National Highway Traffic Safety Admin.*, 956 F.2d 321, 326–27 (D.C. Cir. 1992).

That Bucknell and Marquette did not discard their wrestling teams until after the 1979 Interpretation had been in effect for "decades," see Maj. Op. at 13, proves little. The Department issued the 1996 Clarification to provide schools with "specific guidance about the [Department's] existing standards," and limited it to a discussion of the Three–Part Test because questions about that test comprised a majority

of those asked about Title IX compliance generally. See Cantú letter at 1. In fact, the rate of drops for male teams, as a proportion of all drops, visibly accelerated after the Clarification: In NCAA Division I, for example, male team drops were 61% of the total in the years 1988–89 to 1995–96, but grew to 76% in the years 1996–97 to 2001–02. NCAA Sponsorship and Participation Report (1982–2002) at 177. While it is true that the GAO Report does not define "gender equity considerations," Maj. Op. at 19, the timing is highly suggestive; in any event, plaintiffs explicitly *alleged* that the Department's interpretation of Title IX caused the cuts, see First Amended Complaint ¶ ¶ 48, 50–52, and that is all the law requires at the pleading stage.

Because plaintiffs' claim belongs to the class where an agency's alleged excess stringency is said to have substantially influenced third parties to make decisions injuring plaintiffs, the most obvious parallel cases are this court's decisions in *Block v. Meese* and *Tozzi v. United States Department of Health and Human Services*. In these cases the causal role was considerably less clear than here, yet we found standing.

In *Block* the Justice Department had classified three films distributed by the plaintiffs as "political propaganda" under the Foreign Agents Registration Act, a finding that required the plaintiffs to make public disclosure of the names of certain recipients and distributors of the films. 793 F.2d at 1307. Plaintiffs claimed that the publication of customers' names would affect their profits, and on cross-motions for summary judgment they submitted Block's affidavit saying that "[a]t least a dozen customers have specifically asked us not to reveal their names," and an affidavit of a library association saying that being listed as a purveyor of political propaganda "could cause problems for [the association] and its members." *Id*. at 1308. Although no customer or potential customer submitted any statement that the prospect of publication had caused it to refrain from purchase or rental on account of the agency action, or that it would do so, we

found standing.[1]  We saw the government's conduct as "creat[ing] a disincentive" for plaintiffs' potential customers to acquire the films, damaging plaintiffs' profits.  *Id.*  Assuming that the disincentive worked through a "false impression," we said that that made no difference.  *Id.* at 1309.  None of the relevant third parties in *Block* actually *said* that it had changed its conduct because of the government's publication of customers' names.

Here we have 171 colleges or universities cutting men's wrestling teams and nearly 100 reporting that they cut men's teams for reasons of "gender equity."  To be sure, they did not explicitly tell GAO that it was the Department's enforcement strategy that suddenly alerted them to the imperatives of gender equity.  But plaintiffs allege such a link, and on a motion to dismiss that (rather plausible) allegation is enough.

In *Tozzi* the plaintiffs challenged an agency report that shifted the chemical dioxin from the category of substances "reasonably anticipated to be" human carcinogens to the category of ones "known" to be carcinogens.  271 F.3d at 303.  As in *Block*, the government argued that, even if the plaintiffs were injured as a result of the change, the plaintiffs' injury was not fairly traceable to that decision.  *Id.* at 308.  The government pointed out that the anti-dioxin movement predated the upgrade, and argued that pressure on companies to reduce the use of dioxin-containing products would continue whether or not dioxin continued to be listed as a known human carcinogen.  *Id.*

Despite these arguments, we found sufficient causation, again on a motion for summary judgment.  We noted that Congress had intended the report to serve as the federal government's authoritative statement on the state of carcinogen research;  that Oakland, Berkeley and San Francisco passed anti-dioxin resolutions citing the agency's preliminary determination about dioxin;  and that a member of the Board

---

[1]  This was in contrast to the public classification of the film, with respect to which plaintiffs submitted a customer affidavit saying that but for the designation it would have purchased a specific film.  *Block*, 793 F.2d at 1308.

of Scientific Counselors noted that the report was a very important document. *Id.* at 309. On this basis we said we had "little doubt" "that the dioxin upgrade will represent a 'substantial factor' in the decisions of state and local agencies to regulate products containing dioxin or of healthcare companies to reduce or end purchases of [these products]." *Id.* "It is not too speculative to conclude that the Report will injure Brevet [a PVC-selling plaintiff] economically, even with the presence of other causal factors." *Id.*

Thus we found causation with little direct evidence. The strongest was perhaps the fact that three cities in the Bay area had referenced the Report in adopting anti-dioxin resolutions; but these were unaccompanied by any statement that any purchaser had heeded them, much less that the Report had "control[led]" those cities' recommendations or even been a major inducement to their issuance. We were quite explicit that third parties' consideration of other factors did not prevent a finding that the Report was likely to be a "substantial factor" in anti-dioxin decisions. *Id.*

In our recent decision in *Crete Carrier Corp. v. EPA*, 363 F.3d 490 (D.C. Cir. 2004), we found no standing, but we emphasized the special conditions. Buyers of the tractors for tractor-trailers argued that a relatively stringent EPA engine emission standard—the 2004 Standard—would increase prices of such tractors. Under certain consent decrees, all significant manufacturers were bound until January 1, 2005 to produce engines meeting the 2004 Standard. We noted that but for the consent decrees, finding causation between enforcement of the 2004 Standard and increased prices for plaintiffs "would be the work of a minute." *Id.* at 493. Because of the consent decrees, however, any price relief for plaintiffs depended on the manufacturers' incurring the costs of reversing their production methods to meet standards less stringent than the 2004 Standard, even though they would have almost immediately have to retool *again* to meet still more stringent standards taking effect January 1, 2007. On summary judgment we found that plaintiffs had offered no evidence to support that scenario. *Id.* at 494. Plainly *Crete Carrier* does not undermine the lesson of *Block* and *Tozzi*.

In rejecting plaintiffs' claims as "purely speculative," the majority makes much of the Supreme Court's decisions in *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976), *Allen v. Wright*, 468 U.S. 737 (1984), and *Warth v. Seldin*. But these cases in no way require that we hold plaintiffs' claim here to be too speculative; indeed, the opinions suggest that plaintiffs there lost more for want of proper pleading than for the theoretically speculative nature of their claims. In *Allen v. Wright*, for example, there was no talk of unduly speculative claims; rather, the plaintiffs simply failed to make the proper allegations. See 468 U.S. at 758 ("The diminished ability of respondents' children to receive a desegregated education would be fairly traceable to unlawful IRS grants of tax exemptions only if there were enough racially discriminatory private schools receiving tax exemptions in respondents' communities for withdrawal of those exemptions to make an appreciable difference in public school integration. Respondents have made no such allegation."). And in *Warth v. Seldin* the Court said, "Petitioners must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease in Penfield and that, if the court affords the relief requested, the asserted inability of petitioners will be removed. We find the record devoid of the necessary allegations." 422 U.S. at 504 (citation omitted).

Similarly, in *Simon* the plaintiffs alleged only that an IRS Revenue Ruling had "encouraged" hospitals to deny service to indigents; it left implicit the corollary that plaintiffs' requested relief would "discourage" hospitals from denying service. 426 U.S. at 42. Presumably, had the plaintiffs alleged a direct causal connection between the IRS Revenue Ruling, hospitals' decisionmaking and plaintiffs' access to hospitals, the Court would not have found plaintiffs' claims to be too speculative. Compare *Simon*, 426 U.S. at 42 ("[I]t does not follow from the allegation and its corollary that the denial of access to hospital services *in fact* results from petitioners' new Ruling" (emphasis added)), with First Amended Complaint ¶ 48 ("As a *direct* and indirect result of

[the Department's] unlawful Title IX policies, therefore, institutions have cut (*i.e.*, eliminated) hundreds of men's teams" (emphasis added)). As this litigation progresses, the plaintiffs would obviously be obliged to produce evidence to substantiate their claims on summary judgment, and, as to controverted material issues, at trial. See, e.g., *Defenders of Wildlife*, 504 U.S. at 561; *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (notice pleading standard relies on summary judgment motions to define disputed issues of fact and dispose of unmeritorious claims); *The Freedom Republicans, Inc. v. Federal Election Comm'n*, 13 F.3d 412, 418 (D.C. Cir. 1994) (rejecting plaintiffs' claims as unduly speculative because plaintiffs had not produced enough evidence on summary judgment). Here the only question is whether the plaintiffs properly *pleaded* a causal connection between their injury and the Department's regulations, which they have. *Simon*, *Allen v. Wright* and *Warth v. Seldin* simply instruct the court to be cautious in making an inferential leap when plaintiffs have not offered specific allegations spelling out the requisite steps of the causal chain.

The majority seizes on a phrase of plaintiffs' counsel at oral argument—the view that relief would afford "better odds" for improved retention or restoration of men's teams, Maj. Op. at 13, 18, and deprecates "better odds" as insufficient or too speculative, *id.* at 9. And it observes that plaintiffs do not claim that any particular school "*necessarily* would forego elimination of a wrestling team . . . in the absence of these interpretive rules." *Id.* at 13 (emphasis added). The implication—that what is not certain is too speculative—reflects a view of the law at odds with our tests. First, the language of counsel at oral argument is no basis for our evaluation of causal links. Second, under our "substantial factor" test, *Community for Creative Non–Violence*, 814 F.2d at 669, we require simply "substantial likelihood of the alleged causality." *Competitive Enter. Inst.*, 901 F.2d at 113. This is a probabilistic test, not susceptible of ready quantification, but plainly not requiring certainty.

Here plaintiffs' allegations indicate high probability. They directly allege that the Department's Title IX interpretations

and its enforcement policies, including the threat of withholding federal funds (meaning *all* forms of federal aid, no matter how unrelated to college athletics, see 20 U.S.C. § 1682), have caused educational institutions to cut men's athletic teams. Although the context is *not* summary judgment, they back it up with the highly suggestive data of the GAO Report. The strength of the causal inference seems at least as compelling as what we found sufficient in *Block* and *Tozzi* on summary judgment.

*Redressability*

Having found that plaintiffs sufficiently alleged a causal connection between their injury and the Department's regulations, it would be unusual to conclude that plaintiffs' injuries cannot be redressed by elimination of the illegal regulations. Both "inquiries require an assessment of how third parties will respond to the agency's action." *Community for Creative Non–Violence*, 814 F.2d at 670; see also *Allen v. Wright*, 468 U.S. at 753 n.19 ("To the extent there is a difference [between causation and redressability], it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested."). Even where, as here, the plaintiffs' requested remedy is a new rulemaking, see First Amended Complaint ¶ 99(B)(iii), we do not assess redressability on the basis of some finely calibrated estimate of what the new rule will be. "Where an agency rule causes the injury, the redressability requirement may be satisfied as well by vacating the challenged rule and giving the aggrieved party the opportunity to participate in a new rulemaking the results of which might be more favorable to it." *America's Cmty. Bankers v. FDIC*, 200 F.3d 822, 828–29 (D.C. Cir. 2000); see also *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 458 (D.C. Cir. 1998).

Plaintiffs' redressability pleadings are straightforward. They ask for an order remanding the current rules to the Department and requiring a rulemaking to amend them so that they will require institutions, to the extent that they

make any gender-conscious decisions on athletic opportunities, "to use interest and ability—not enrollment—as the relevant population." First Amended Complaint ¶ 99(A)(iii), (B)(iii). They explicitly allege that grant of the relief requested "will redress the injuries alleged herein." *Id.* ¶ 53. Given the allegation that the Department's actions were the cause of the injury, it follows logically that removal of that cause would supply redress.

The government's arguments add nothing to what is already implicit in the discussion of causation. Indeed, it seems to misunderstand what is required of plaintiffs here, arguing that the plaintiffs must show that different Department regulations would cause a school that has eliminated a team to reinstitute that team. Appellee's Brief at 24. While such an allegation may be necessary for the three college-specific associations to maintain their claims,[2] the other plaintiff associations need neither to demonstrate nor even allege such a direct result. They have plainly alleged that the alleged wrongdoing is ongoing and continues to affect educational institutions' decisionmaking. See First Amended Complaint ¶ 48 (the Department's "unlawful Title IX policies directly and indirectly have reduced (and continue to limit) participation opportunities for male athletes."). Under these circumstances, the redressability requirement is satisfied if there can be "a sanction that effectively abates that conduct and prevents its recurrence." *Laidlaw*, 528 U.S. at 185–86.

---

[2] Although the plaintiffs submitted a press release directly linking the elimination of Bucknell's wrestling team to the Department's Title IX policies and regulations, see Bucknell News Release (May 2, 2001) (stating that Bucknell cut men's wrestling team to attempt to "keep[ ] women represented in its varsity programs to the same degree they are represented in the student body"), nowhere in the complaint did they allege that a change in the regulations would cause Bucknell, Marquette or Yale either to rethink cuts already made or to redress in some other way the injuries suffered by student athletes and alumni at those schools. Thus, as to the college-specific associations, it appears that this may be the rare circumstance where the allegations are sufficient to establish causation but not redressability.

Similarly, the government faults the plaintiffs for failing to allege that any member coaches are employed by educational institutions that "have declared any intention now or in the future to initiate the cutting or capping of athletic teams," Appellee's Brief at 24, and it suggests that the plaintiffs' complaint should have listed the schools at which their members coach, *id.* at 24–25. But under "notice pleading," a court on a motion to dismiss must "presume[e] that general allegations embrace those specific facts that are necessary to support the claim." *Defenders of Wildlife*, 504 U.S. at 561 (alteration in original); see also Rule 8(a)(2), Fed. R. Civ. Pro.; *Swierkiewicz*, 534 U.S. at 512; *Bennett*, 520 U.S. at 168 ("Given petitioners' allegation . . . it is easy to presume specific facts under which petitioners will be injured"). Given that the plaintiffs have alleged both that they are national organizations representing coaches in a number of men's sports, see First Amended Complaint ¶ ¶ 4, 8, and that they are suffering *ongoing* injury due to the Department's regulations, *id.* ¶ 48, we must infer that these allegations embrace the specific facts necessary to support plaintiffs' claims, i.e., that plaintiffs' member coaches are employed by educational institutions that would, in the event of a Department retreat, be either substantially *less* likely to cut or cap men's teams in the future to comply with the Department's Title IX regulations and policies, or substantially *more* likely to support increases in men's sports opportunities. The proper comparison, of course, is between men's sports opportunities under the current regime and men's sports opportunities under a future regime in which the Department's enrollment proportionality requirement has been removed. See *Competitive Enter. Inst. v. National Highway Traffic Safety Admin.*, 956 F.2d at 326–27. It is of no consequence that the Department has no obligation to proceed in the future by rulemaking, compare Maj. Op. at 14, so long as it is *substantively* barred from pursuit of enrollment proportionality, in disregard of varying levels of interest and skill.

\* \* \*

As an alternative holding, the majority finds the plaintiffs' suit unreviewable under the Administrative Procedure Act, 5

U.S.C. §§ 701–706, because it believes the plaintiffs may achieve an adequate remedy by suing individual colleges and universities directly. See generally *id*. § 704 (limiting judicial review to "final agency action for which there is no other adequate remedy in a court"). I believe the majority's reasoning is mistaken here as well.

As the Supreme Court explained in *Bowen v. Massachusetts*, § 704 is to be read narrowly so as not "to defeat the central purpose of providing a broad spectrum of judicial review of agency action." 487 U.S. 879, 903–04 (1988); see also *Esch v. Yeutter*, 876 F.2d 976, 982 (D.C. Cir. 1989). The adequate remedy question is a practical one: would the alternative remedy afford the same relief to plaintiffs as suit under the APA? See, e.g., *Women's Equity Action League v. Cavazos*, 906 F.2d 742, 751 (D.C. Cir. 1990) (looking at statutory remedies available to plaintiff in judging question of adequacy); *Council of and for the Blind v. Regan*, 709 F.2d 1521, 1532 (D.C. Cir. 1983) (comparing remedies available under APA and the Revenue Sharing Act).

In this case, the remedy sought by plaintiffs is a new rulemaking by the Department of Education, First Amended Complaint ¶ 99(B)(iii), one that would eliminate enrollment proportionality as a "safe harbor" for compliance with Title IX, *id*. ¶ 99(A)(iii). The plaintiffs also seek to prohibit the Department from "requiring or authorizing institutions to engage in gender-conscious cutting or capping to meet a disparate-impact standard." *Id*. ¶ 99(A)(ii). Although the plaintiffs may sue individual institutions directly to redress discrimination proscribed by Title IX, see *Cannon v. University of Chicago*, 441 U.S. 677 (1979), such a suit would not achieve plaintiffs' desired remedies. Government coercion may be illegal even though the induced third-party action is itself legal. Just as in *Tozzi* and *Block* the allegation was that illegal government stigmatization would induce third parties to avoid products that they were clearly free to avoid on their own (dioxin-containing products in one case, specific films in the other), here government pressure toward enrollment-based "gender equity" may be illegal but private parties' pursuit of such gender equity perfectly legal. Cf. *United*

*Steelworkers v. Weber*, 443 U.S. 193, 201 (1979) (allowing private parties to adopt an affirmative action plan containing racial preferences that the Court assumed the government could not lawfully have required). Because individual suits against educational institutions would not provide plaintiffs with an adequate remedy for their injury, § 704 cannot provide a basis for finding plaintiffs' claims unreviewable.

\* \* \*

For the foregoing reasons I would reverse the district court.